JASON WILEY, ESQ.
Nevada Bar No. 9274
**WILEY PETERSEN**
10000 West Charleston Blvd., Ste. 230
Las Vegas, Nevada 89135
Telephone: 702.910.3329
Facsimile: 702.553.3467
jwiley@wileypetersenlaw.com

ARI KAREN, ESQ. (*pro hac vice forthcoming*)
akaren@mitchellsandler.com
LUCAS MARKOWITZ, ESQ. (*pro hac vice forthcoming*)
lmarkowitz@mitchellsandler.com
ALEXANDER ROGOSA, ESQ. (*pro hac vice forthcoming*)
Will comply with LR IA 11-2 within 14 days
arogosa@mitchellsandler.com
**MITCHELL SANDLER PLLC**
2020 K Street NW, Suite 760
Washington, DC 20036
Office: (202) 886-5265

*Attorneys for Plaintiff Luminate Home Loans, Inc.*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| LUMINATE HOME LOANS, INC., | CASE NO.: 2:24-cv-2403 |
| Plaintiff, | |
| vs. | |
| SYDNEY LYNN, | **LUMINATE HOME LOANS, INC.'S VERIFIED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendant. | |

### <u>VERIFIED COPMLAINT FOR INJUNCTIVE RELIEF AND FOR DAMAGES</u>

Plaintiff Luminate Home Loans, Inc. by and through its undersigned counsel, hereby files this Verified Complaint against Defendant Sydney Lynn, seeking injunctive relief, monetary relief, and such other relief as the Court deems appropriate, and in support thereof, alleges as follows:

## NATURE OF THE ACTION

This matter arises out of Defendant Sydney Lynn's ("Defendant Lynn") participation in a months' long scheme against her employer, Luminate Home Loans, Inc. ("Luminate" or "the Company"), to transmit extensive confidential, proprietary, and trade secret information of the Company to a competitor, Better Mortgage Company ("Better"). Defendant Lynn and other managers at Luminate worked with Better in an effort to effectively divert Luminate's retail loan "NEO division" to Better, which had no prior experience or infrastructure to engage in or manage such retail loan operations. Defendant Lynn helped provide Better with Luminate's organizational documents, operational procedures and training information, loan offerings, pricing information, performance and revenue data, compensation details for Luminate's employees, branch and corporate cost allocations to profitably run the division, and anything else Better requested to enable it to hijack this business from Luminate. Defendant Lynn also assisted with the solicitation of other Luminate employees to Better, all while she remained a Luminate employee on paper. When Defendant Lynn feared the Company was onto her, she downloaded thousands of essential business files from Luminate that would be of incredible value to her and Better. These actions were all in violation of federal and state laws as well as Defendant Lynn's employment obligations and fiduciary duties. Since being terminated and confronted with Luminate's knowledge of her misconduct, Defendant Lynn has refused to return the sensitive materials she took from the Company.

## PARTIES

1.     Plaintiff Luminate Home Loans, Inc. is a Minnesota corporation with a principal place of business at 2523 Wayzata, Suite 200, Minneapolis, MN 55405.

2.     Defendant Sydney Lynn is an individual who currently resides at 7880 West Maule Avenue, Unit 1173, Las Vegas, NV 89113.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because this action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

4.      This Court further has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as there is complete diversity between the Parties, since Luminate is a citizen of Minnesota under the statute and Defendant is a citizen of Nevada under the statute, and the amount in controversy exceeds $75,000.

5.      This Court has personal jurisdiction over Defendant as set forth in Nev. Rev. Stat. § 14.065 because Defendant is a resident of Nevada and because of the intentional tortious activity she engaged in in Nevada.

6.      Venue is proper in this district under 28 U.S.C. § 1391 because Defendant resides in this District, a substantial part of the events giving rise to the claims asserted herein occurred in this District, and Defendant is a resident of the state and subject to jurisdiction in this District.

## FACTUAL BACKGROUND

7.      Luminate began as the entity AMEC Home Loans in 1998 and rebranded to Luminate Home Loans, Inc. in 2020.  It operates as a provider of real estate financing solutions, offering its customers a variety of mortgage products.

8.      The company began with only six employees and has expanded to over 500 loan originators, with additional operations staff, providing mortgage services across the country.

9.      In the fall of 2022, Luminate investigated an opportunity to acquire a unique mortgage division known as NEO Home Loans ("NEO") from a struggling competitor, Celebrity Home Loans LLC.

10.     Following a diligent and arms' length analysis of the assets and liabilities of the division in conjunction with Celebrity Home Loans, and good faith negotiations, the purchase was finalized on December 6, 2022, and announced publicly.  *See* Asset Purchase Agreement Attached as Exhibit 1. The asset purchase agreement included Luminate's acquisition of all assets related to the NEO division and the operation of its branches, including but not limited to the relevant trade secrets and intellectual property associated therewith:

> Confidentiality. Seller acknowledges that the businesses and the business objectives of Buyer involve the acquisition of the Purchased Assets, including confidential and proprietary information relating to the Purchased Assets, in consideration for good and valuable consideration provided by Buyer as described in Article II hereof, the sufficiency of which is hereby acknowledged. Seller acknowledges and agrees that it would be unfair to divulge or utilize such information relating to such

businesses and the Purchased Assets or goodwill related thereto in competition with Buyer after a Branch Closing Date. Therefore, after a Branch Closing Date, neither Seller nor any of its Affiliates shall, directly or indirectly, divulge any trade secrets, customer lists, pricing information, marketing arrangements or strategies, business plans, internal performance statistics, training manuals, personnel information, Intellectual Property or any other information concerning the applicable Branch location or its operations ("Confidential Information") to any third party without Buyer's prior written consent or use any Confidential Information to compete with Buyer or Buyer's Affiliates; provided, however, that Seller may disclose or use Confidential Information if it is compelled to do so by judicial or administrative process, in which case Seller and its Affiliates shall, to the extent permitted by Applicable Law, notify Buyer promptly of the request or requirement so that Buyer and/or its Affiliates may seek an appropriate protective order or waive compliance with the provisions of this Section 6.5(a).

*See* Ex. 1 at Section 6.5(a). Moreover, the agreement further defined intellectual property as:

"Intellectual Property" means: (a) patents, patent applications, and patent rights, (b) copyrightable works, copyrights, moral rights, mask work rights, database rights and design rights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions, (c) trademarks, service marks, design marks, logos, trade dress, internet domain names, business names, and trade names, and registrations and applications for registration, together with all of the goodwill associated with, any of the foregoing and (d) trade secrets, know-how and other confidential business information ("Trade Secrets"). For clarity and avoidance of doubt, Intellectual Property excludes the names "Celebrity", "Celebrity Home Loans", "Celebrity Financial" and all trademarks, service marks, design marks, logos, trade dress, internet domain names, business names, and trade names, and registrations and applications for registration, together with all of the goodwill associated therewith.

*See* Ex. 1 at Section 1.1.

11.    After this purchase was finalize, Luminate took steps to onboard existing NEO employees from Celebrity Home Loans LLC into their company.

12.    Daniel Horanyi ("Horanyi") was identified to serve as a Division President at Luminate for the NEO division, along with others, when they made the transition from Celebrity Home Loans LLC.

13.    Luminate ultimately hired and onboarded around 350 people in this acquisition, investing significant resources to integrate these employees into Luminate and sharing Luminate's infrastructure to provide support for this new division.

14.    Luminate made significant developments to its NEO division over the next three years to refine its business strategies and make it a successful division, providing extensive support to the division through marketing, hiring, cost-sharing, experience and communication, product support and data analytics, human resources, and other areas.

15.     NEO functioned within Luminate's larger structure as one source of its mortgage operations and fulfillment offerings, with other branches of Luminate's business handling manufacturing processes for those NEO loans, such as appraisals, disclosures, and other aspects.

16.     One notable development Luminate made with its NEO division was through creating a mortgage option that enabled borrowers to present "cash offers" on their home purchases, a major factor in having a bid accepted in today's competitive environment.

17.     Luminate's advancements as a company, including through its development of the NEO division, led to its recognition as the third fastest-growing nonbank mortgage originator in the nation in September 2024.

18.     Luminate continued to support and expand its NEO division, devoting months of work in 2024 to set up NEO as its own wholly owned subsidiary of Luminate's parent company, Luminate Bank, and giving NEO division managers further access and information on Luminate to prepare for this.

19.     In October 2024, Luminate became aware that the NEO division leadership, including Defendant Lynn and led by Horanyi, were meeting collectively with other mortgage lenders about leaving Luminate.

20.     Luminate sought to remedy any dissatisfaction its employees had so the Company's CEO, as well as the Company director, each met with the NEO division's managers, but they denied any dissatisfaction or interest in other companies rather than working to address any concerns together.

21.     The suspicious and evasive conduct of these individuals led Luminate to exercise its right to review and monitor its employees' work devices, reviewing emails and data access for some key individuals within the NEO division.

22.     During the course of this comprehensive investigatory process, Luminate discovered NEO leadership were meeting extensively with another lender, Better,[1] and sharing Luminate confidential information and trade secrets.

---

[1] A civil action is currently pending against Better, Horanyi, and other individual former employees of Luminate in the United States District Court for the Southern District of California, case number: 3:24-cv-2251-BAS-MSB.

23.     Better was founded in 2003 and is a competitor in the mortgage industry to Luminate. But upon information and belief, Better has never had a retail lending division like Luminate does, of which NEO is a part.  Acquiring Luminate's confidential information and trade secrets about how Luminate operated NEO were paramount to making this a successful expansion of Better's operations.

24.     On October 25, 2024, Luminate terminated Horanyi, along with some other employees from its NEO division that Luminate identified as likely engaging in this misconduct.  The continuing investigation would reveal Luminate's suspicions were correct.

25.     Having been forced to terminate much of the leadership structure of its NEO division because of this illicit conduct, Luminate announced on October 25, 2024, that it would be restructuring with regard to the NEO division to ensure proper management and continued lending operations of its couple hundred employees currently working in that group.

26.     Through Luminate's continuing review of this misconduct, the Company found that some of its managers held Teams meetings and exchanged frequent email communications with Better using their Luminate work computers and during the work day to coordinate on efforts to provide whatever information would assist Better in surreptitiously assuming Luminate's NEO division and to discuss their targeting of other Luminate employees for recruitment to Better.

27.     Monitoring of Defendant Lynn's Luminate computer revealed she continued to coordinate with these terminated employees and Better after the other individuals were terminated on October 25, 2024, to assist them with how Better could set up retail loan operations to bring Luminate's division to this competitor.

28.     Luminate also later discovered that on October 25, 2024, upon learning of the terminations of other leaders of the NEO division, Defendant Lynn downloaded 3,998 confidential Luminate files to a flash drive that contained highly valuable and sensitive information about Luminate's business operations and loan data.

29.     Luminate then carefully tried to understand what these stolen files contained.  Upon information and belief, many of the files Defendant Lynn stole and downloaded on to this flash drive contain potentially non-public information about customers.

30.     Luminate terminated Defendant Lynn on December 5, 2024, and demanded the immediate return of its company property including its trade secrets, confidential and proprietary information.

31.     Upon information and belief, Defendant Lynn was offered a job at Better after her termination.

32.     On December 16, 2024, Defendant Lynn shipped her work computer back to Luminate but has not returned the flash drive, despite acknowledging its existence and her downloading of extensive Luminate information onto it.

33.     Luminate even offered not to take possession of the flash drive, but to have Defendant Lynn send it to a third-party forensic computer expert for preservation and segregation of Luminate's data.  However, Defendant Lynn refused because she evidently still wants to use the stolen data in her new role at Better.

**Defendant's Employment and Contractual Obligations**

34.     Defendant Lynn began her employment with Luminate on December 27, 2022, as a Director of Finance.

35.     Defendant Lynn was responsible for ensuring the overall stability of Luminate's finances and managing the Company's financial status.  The nature of that employment meant Luminate entrusted her with confidential and proprietary information about Luminate's operations, strategies, and employees.

36.     As a material term and consideration for her employment with Luminate, and in exchange for fair salary compensation, Defendant Lynn reviewed and signed Luminate's Employee Handbook on December 29, 2022.  *See* Defendant's Employee Handbook Excerpt attached as Exhibit 2.

37.     The employee handbook confirmed that Defendant Lynn was an at-will employee.  In signing the handbook, she expressly agreed not to engage in outside employment which impacted the performance of her job duties at Luminate or presented a conflict of interest.  *Id. §* 5.5.  She also agreed in her employment with Luminate to abide by "the principles of fair dealing and ethical conduct" and to demonstrate "the highest standards of conduct and personal integrity."  *Id. §* 5.2.  Violations of

Luminate's standard of conduct were specifically noted to include disclosure "of Company trade secrets and proprietary and confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development information, customer lists, patents, trademarks, etc.) of the company or its customers, contractors, suppliers, or vendors." *Id.* § 5.1.

38.     Luminate's policy on the use of company technology is also clearly articulated in the handbook, which Defendant Lynn agreed to abide by.  This included that "all content maintained in company IT resources and communications systems are the property of the company" and are to be used for business purposes for the benefit of Luminate.  *Id.* § 6.5.  The policy confirms that there is no expectation of privacy for employees when using these systems and employees agree that the company may "monitor, intercept, and/or review all data transmitted, received, or downloaded over Company IT resources and communications systems." *Id.*

39.     Luminate maintains a detailed section regarding its confidential business information and trade secrets to ensure employees such as Defendant Lynn who are entrusted with access to them, protect that closely guarded information for the benefit of Luminate.

40.     Defendant Lynn agreed that the "protection of confidential business information is critical to the success of Luminate Home Loans.  Information about the company, its clients or employees should not be divulged to anyone other than persons who have a right to know or are authorized to receive such information." *Id.* § 9.1.  Defendant Lynn was clearly advised that she was "not permitted to use confidential information obtained as a result of employment with Luminate Home Loans (whether still employed or not) for the purpose of furthering any private interest, or as a means of making personal gains." *Id.*

41.     Luminate advised employees such as Defendant Lynn that they "may not illegally duplicate any licensed software or related documentation . . . [they] may not duplicate, copy, or give software to any outsiders including clients, contractors, customers, and others." *Id.* § 9.3.

42.     On or about December 22, 2022, as a material term and consideration for Defendant Lynn's employment with Luminate, and in exchange for fair salary compensation, she signed

Luminate's policy prohibiting any dual employment that could create a conflict of interest with Luminate.  *See* Lynn Dual Employment Agreement attached as Exhibit 3.

**Breaches of Fiduciary Duties; Theft of Trade Secrets and Computer Files**

43.     Luminate's Information Technology ("IT") department began reviewing the computer usage of Defendant Lynn and other NEO leaders under suspicion that they were meeting collectively about opportunities with other lenders and no longer optimizing NEO's services with Luminate.

44.     Luminate's IT department used a computer monitoring system called Teramind, under the Company's Employee Handbook, to investigate the download histories and external communications by Defendant Lynn and other NEO leaders.

45.     The review is ongoing, but thus far has revealed substantial improper activity violating the terms of Defendant Lynn's employment, as well as state and federal laws, including through the transmission of Luminate's confidential information and trade secrets directly to their competitor, Better.

46.     The Teramind software captured many images and activity records from the computers of those under investigation, confirming the illicit conduct of Defendant Lynn and other managers.

47.     For example, on August 12, 2024, Better requested extensive details about the financial obligations and payment structures necessary to operate the NEO division if they proceeded with plans to attempt to steal this business group from Luminate.  *See* Payment Structure Email Exchange attached as Exhibit 4.  Defendant Lynn provided insight on the total payroll expenditures necessary to operate this division and breakdowns for how to structure individual manager compensation based on Luminate's confidential contractual agreements with its employees.  *Id.*

48.     On September 7, 2024, Horanyi updated Chad Smith, Better's President and Chief Operations Officer, confirming that he and the other Luminate NEO managers who were copied on the email, including Defendant Lynn, had proceeded with their collective plan and approached Luminate Branch Leaders about moving to Better, and they presented the branch leaders with a write-up detailing how revenue would be shared at Better if they moved their branches there.  *See* Better NEO Economic Model Email attached as Exhibit 5.

49.    Defendant Lynn continued to participate in email exchanges, calls, and meetings with Better and other managers of the NEO division to effectuate these efforts to design retail loan operations for Better and facilitate the theft of Luminate's NEO division.

50.    On October 18, 2024, Better provided Luminate's employees, including Defendant Lynn, with their detailed plans for launching NEO at Better, acknowledging their intent to effectively steal Luminate's division by references that they would replace Luminate's marketing material of "NEO Powered by Luminate" with "NEO Powered by Better," take over Luminate's neohomeloans.com website, continue utilizing the Youtube Channel set up for Luminate's NEO division and even maintain the marketing videos created by Luminate, and potentially keep the signage Luminate put in place for its NEO offices.  *See* Better NEO Marketing Email attached as Exhibit 6.  In response Horanyi transmitted a list of purchased leads and loan files by state for the last ninety days to ensure the NEO retail sales division at Better would begin with an unfair head-start with customers and revenue production to match the massive advantage they obtained by misappropriating Luminate's trade secrets for the establishment and management of such a retail sales division.  *See id.*

51.    On October 23, 2024, Defendant Lynn provided to Horanyi, knowing this information would be given to and used by Better, a Luminate report breaking down each of its branches' margins for all loan type categories offered by Luminate, providing an extensive playbook on what type of loans Luminate considered worthwhile and their profitability broken down by region as well as loan officer, ultimately providing Better nearly five thousand fields of valuable proprietary data.  *See* Branch Margin Email attached as Exhibit 7.

52.    On October 24, 2024, Better requested copies of all facility lease agreements for Luminate's NEO division from Defendant Lynn and other Luminate employees, evidently intending to take over these facilities, or at least all profitable offices, when they went public with their intended theft of Luminate's division.  *See* Facility Leases Email attached as Exhibit 8.

53.    Defendant Lynn, Better, and the other Luminate managers involved, took steps to try to limit and conceal the transmission of Luminate materials directly into Better's servers, instead setting up an external Box Folder for Luminate's employees to funnel these trade secrets and confidential information into where Better's employees could then access them.  *See* Box Folder Screenshot

attached as Exhibit 9.  This folder was created by Max Goodman, an associate general counsel at Better, who no doubt understood the legal implications of receiving and utilizing Luminate's trade secrets, hence the desire to cloak how Better obtained this material.  *See id.*

54.    Defendant Lynn coordinated with Better and others to enable Luminate's competitor to extensively use the Company's trade secrets and confidential information to gain the ability to create a retail loan division that Better had no previous experience with.  To accomplish this, Defendant Lynn was specifically tasked, while remaining a Luminate employee, to provide Better with financial analysis of Luminate's branches and how they could be used at Better, including, but not limited to, the creation of Branch Pro Formas and setting corporate allocations.  *See* Spreadsheet Assigning Division Development Tasks for Better attached as Exhibit 10.

**Transfer of Trade Secrets and Computer Files To Flash Drive and Refusal To Return**

55.    On October 25, 2024, based on records captured from Defendant Lynn's work device, she downloaded to a flash drive mountains of confidential and proprietary information, including, among other things, training materials, employee roster and salary lists, employment and third-party contracts, business strategies, loan processing procedures, loan profit margins, financial details for Luminate's divisions and branches, economic models, revenue and performance reviews, completed loan information, secondary market sales data, loan lead lists and leads.  *See* External Drive Download Record attached as Exhibit 11.  Luminate's IT department recently analyzed this activity and identified on an Excel spreadsheet each of the 3,998 downloaded files to the flash drive, which highlights the proprietary and confidential information contained therein.  *See* Spreadsheet Detailing Contents of Defendant's Flash Drive attached as Exhibit 12.  Upon information and belief, this includes nonpublic information on Luminate borrowers.

56.    Defendant Lynn executed this rampant acquisition of Luminate's company data upon learning that other managers of Luminate's NEO division, including Horanyi, were being terminated for their illicit conduct.  She evidently feared she may be terminated as well causing them to lose access to this valuable Company information they needed to create this competing division at Better.

57.     Defendant Lynn was not terminated at this time because the extent of her misconduct and participation in this scheme was not yet understood by Luminate.  Her financial role in the day-to-day business of the division were also important to maintaining smooth operations of the Company.

58.     The Company's monitoring of Defendant Lynn's work activity after October 25, 2024, revealed that she continued to engage extensively and participate in regular meetings with Better and the terminated employees about how to shift Luminate's NEO division to the competitor and establish profitable operations for Better.

59.     The Company discovered that Defendant Lynn coordinated with Horanyi and other managers in efforts to solicit important Luminate employees, including branch leaders and high revenue producers, to Better while they were all officially still employed by Luminate.  *See* Lynn Teams Chat on October 25, 2024 attached as Exhibit 13.  Defendant Lynn and other managers coordinated for trips for more than fifty Luminate employees to Dallas and New York City during which they pitched them on moving to Better with them, then later submitted expense reimbursement requests to Luminate for the costs of these trips.  *See* Lynn Teams Chat on October 23, 2024 attached as Exhibit 14. Moreover, Defendant Lynn reassured one such Luminate employee that if Luminate discovered the basis for these trips and refused to pay reimbursement requests for the expenses they incurred "we will make it right by you" and "regardless if they do or not you will be reimbursed." *Id.*

60.     Based on the extensive misconduct the Company observed by Defendant Lynn and her boldfaced denials when confronted on these developments by the Company, Luminate terminated her employment on December 5, 2024.  Upon terminating Defendant Lynn, the Company notified her that it was aware of the flash drive she created and the extensive sensitive data she obtained.  She was then sent a formal Separation Letter by Luminate's counsel, which included a demand for the immediate return of the flash drive and her Luminate work computer in prepaid shipping packages provided by the Company.  *See* Separation Letter attached hereto as Exhibit 15.

61.     After follow-up efforts by Plaintiff's counsel, Defendant Lynn finally shipped her Luminate work computer back to the company on December 16, 2024.  *See* Email Communication with Defendant Lynn attached as Exhibit 16.  She also identified her continued possession of the flash drive and alleged that she had not disseminated its contents with outside parties such as Better or other

former Luminate employees.  *See id.*  Yet Defendant Lynn did not agree to return this flash drive and its data to Luminate, nor did she consent to sending it to a secure third-party forensic discovery vendor. *See id.*

**Detrimental Impacts Unfolding From Defendant's Conduct**

62.    Defendant Lynn's work on behalf of Better while a Luminate employee has caused substantial damage to the Company by enabling its competitor to create competing business operations and position it to recruit away numerous high producing employees, if not Luminate's entire division. Better did not have the knowledge or expertise to establish its retail loan operations or organize a competing division without the assistance of Defendant Lynn and the misappropriation of the Company's trade secrets and confidential information.

63.    Defendant Lynn assisted with the solicitation of several coworkers to Better while she was an employee of the Company, many of whom have resigned or are considering transitions to this competitor.

64.    Defendant Lynn said that she expects Luminate's entire NEO division to leave for Better by February 28, 2025.

65.    Better has revealed its intent to formally hire Defendant Lynn imminently.

66.    Defendant Lynn's misappropriation of confidential company data, including information on borrowers, risks triggering data breach protocols for Luminate which would cause substantial impact to its business operations through the required disclosure to regulators, borrowers, and the public.  This would severely impact Luminate's position in the marketplace moving forward.

**COUNT I**
**Breach of Contract**

67.    Luminate incorporates all previous paragraphs as if fully set forth herein.

68.    Defendant Lynn was an at-will employee of Luminate during the periods identified in this Complaint, up until her termination for cause on December 5, 2024.

69.    As a material term and condition for her employment with Luminate, and in exchange for fair salary compensation, Defendant Lynn agreed to abide by the terms of Luminate's Employee Handbook that set forth certain obligations regarding her employment with Luminate.  *See* Exhibit 2 at § 5.2.

70.     Defendant Lynn acknowledged that it was a violation of Luminate's standard of conduct and the terms of her employment to disclose "company trade secrets and proprietary and confidential commercially-sensitive information (i.e. financial or sales records/reports, marketing or business strategies/plans, product development information, customer lists, patents, trademarks, etc.) of the company." *See id.* at § 5.1.

71.     Defendant Lynn agreed that the "protection of confidential business information is critical to the success of Luminate Home Loans. Information about the company, its clients or employees should not be divulged to anyone other than persons who have a right to know or are authorized to receive such information." *See id.* at § 9.1. Defendant Lynn was clearly on notice that she was "not permitted to use confidential information obtained as a result of employment with Luminate Home Loans (whether still employed or not) for the purpose of furthering any private interest, or as a means of making personal gains." *See id.* at § 9.1.

72.     Defendant Lynn agreed not to "illegally duplicate any licensed software or related documentation . . . [she] may not duplicate, copy, or give software to any outsiders including clients, contractors, customers, and others." *See id.* at § 9.3.

73.     Defendant Lynn further agreed as a material term and condition for her employment with Luminate to sign Luminate's distinct policy agreeing that she was prohibited from engaging in any dual employment that could create a conflict of interest with Luminate. *See* Exhibits 3.

74.     Defendant Lynn breached her employment terms by *inter alia*, using, disclosing, and/or stealing Luminate's trade secrets and confidential and proprietary information for her individual benefit and that of Luminate's competitor, Better, and by assisting in the solicitation of Luminate employees to terminate employment with Luminate and join Better.

75.     As a proximate result of Defendant Lynn's breach, Luminate has suffered, and will continue to suffer, damages and loss.

76.     Defendant Lynn's actions were intentional, willful, outrageous, and malicious, and justify the imposition of exemplary damages.

77.     Defendant Lynn's conduct had and will continue to cause irreparable harm to Luminate.

/ / /

## COUNT II
### Breach of Fiduciary Duties

78.    Luminate incorporates all previous paragraphs as if fully set forth herein.

79.    As a leader at Luminate for its NEO division, the Company placed confidence in Defendant Lynn to act in good faith with regard to Luminate's interests.

80.    Defendant Lynn was in a position of trust and influence at Luminate.

81.    Given the nature of Defendant Lynn's relationship with Luminate, she owed the Company certain fiduciary duties, including the duty of loyalty, good faith, fair dealing, to act in Luminate's best interest, and to avoid acting in a manner detrimental to its financial, business, and other interests.

82.    Defendant Lynn breached her fiduciary duties to Luminate by, among other things, soliciting and/or attempting to solicit Luminate employees while she was still an employee of Luminate, to terminate their employment and/or violate their obligations to their employer Luminate, and make arrangements to join Luminate's competitor, Better.

83.    During the periods identified in this litigation, Defendant Lynn ceased working on behalf of Luminate's interests and failed to execute her job duties with the Company, thereby inhibiting and diminishing the Company's productivity and revenue.

84.    Defendant Lynn also sought and received reimbursement from Luminate for expenses purportedly incurred during the performance of her job duties that were in actuality spent in furtherance of her efforts to solicit Luminate employees to join their competitor.

85.    Defendant Lynn directed and encouraged other Luminate employees to seek reimbursement for expenses they incurred while meeting to consider solicitation efforts to join Better and such wrongful reimbursement requests were submitted to and paid by Luminate.

86.    In acting in the manner described above, Defendant Lynn did not exercise the care required in her position, in that she used her positions of trust and confidence to further her own interests and the interests of Better, and in doing so, caused injury to Luminate.

87.    As a result, Defendant Lynn breached her fiduciary duties and duty of loyalty owed to Luminate and Luminate has been and continues to be irreparably harmed by Defendant Lynn's actions.

/ / /

**COUNT III**

**Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836**

88.    Luminate incorporates all previous paragraphs as if fully set forth herein.

89.    The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3), defines a trade secret as, *inter alia*, "all forms and types of financial, business, scientific, technical, economic, or engineering information, . . . whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" – provided that the owner took "reasonable measures to keep such information secret," and it offers the holder of the trade secret an advantage over competitors who do not know or use the trade secret.

90.    Luminate's confidential and proprietary information stolen and misappropriated by Defendant Lynn includes, among other things, training materials, employee roster and salary lists, employment and third-party contracts, business strategies, loan processing procedures, loan profit margins, financial details for Luminate's divisions and branches, economic models, revenue and performance reviews, completed loan information, secondary market sales data, loan lead lists and leads.

91.    This material constitutes trade secrets under the DTSA, all of which would provide a competitor a significant advantage in creating a competing retail loan division based on Luminate's model for its NEO division.

92.    Luminate derives independent economic value from its confidential data and trade secrets including its employee data, business organization and strategies, company financial forecasting and review, its loan pricing information, its secondary market sale terms, as well as its customer and lead information.

93.    Luminate's trade secrets are related to products or services used in interstate commerce.

94.    Luminate takes steps to protect this proprietary information by restricting employees' access, using password protected logins for certain information, and having employees who will be provided access to such privileged business information sign or acknowledge employment provisions confirming they will not distribute or misuse these trade secrets.

95.     Defendant Lynn was entrusted with trade secret information in the performance of her job.

96.     Defendant Lynn improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), disclosed and/or used these trade secrets, for the use and benefit of Better, a competitor of Luminate.

97.     Defendant Lynn is wrongfully in possession of extensive trade secret information in the form of a flash drive to which she downloaded 3,998 confidential Luminate files containing highly valuable and sensitive information on Luminate's business operations and loan data.

98.     As a result of Defendant Lynn's actions, Luminate is entitled to damages in the amount of at least One Million Dollars.

**COUNT IV**
**Misappropriation of Trade Secrets in Violation of**
**Nevada's Uniform Trade Secrets Act**

99.     Luminate incorporates all previous paragraphs as if fully set forth herein.

100.    The Nevada Uniform Trade Secrets Act ("NUTSA"), Nev. Rev. Stat. § 600A.035 prohibits the misappropriation of trade secrets.

101.    The NUTSA defines "trade secret" as information that "(1) [d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain commercial or economic value from its disclosure or use; and (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Nev. Rev. Stat. §600A.030(5).

102.    The NUTSA defines "misappropriation" as "(a) Acquisition of the trade secret of another by a person by improper means; (b) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (c) Disclosure or use of a trade secret of another without express or implied consent by a person who: (1) Used improper means to acquire knowledge of the trade secret; (2) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: (I) Derived from or through a person who had used improper means to acquire it; (II) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (III) Derived from or through a person who owed a duty

17

to the person seeking relief to maintain its secrecy or limit its use; or (3) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." Nev. Rev. Stat. § 600A.030(2).

103.    Luminate's confidential and proprietary information stolen and misappropriated by Defendant Lynn includes, among other things, training materials, employee roster and salary lists, employment and third-party contracts, business strategies, loan processing procedures, loan profit margins, financial details for Luminate's divisions and branches, economic models, revenue and performance reviews, completed loan information, secondary market sales data, loan lead lists and leads.

104.    This material constitutes trade secrets under the NUTSA, all of which would provide a competitor a significant advantage in creating a competing retail loan division based on Luminate's model for its NEO division.

105.    Luminate derives independent economic value from its confidential data and trade secrets including its employee data, business organization and strategies, company financial forecasting and review, its loan pricing information, its secondary market sale terms, as well as its customer and lead information.

106.    Luminate's trade secrets are related to products or services used in intrastate commerce.

107.    Luminate takes steps to protect this proprietary information by restricting employees' access, using password protected logins for certain information, and having employees who will be provided access to such privileged business information sign or acknowledge employment provisions confirming they will not distribute or misuse these trade secrets.

108.    Defendant Lynn was entrusted with trade secret information in the performance of her job.

109.    Defendant Lynn is wrongfully in possession of extensive trade secret information in the form of a flash drive to which she downloaded 3,998 confidential Luminate files containing highly valuable and sensitive information on Luminate's business operations and loan data.

110.   Defendant Lynn improperly, unlawfully, and maliciously (or, in the alternative, in bad faith), disclosed and/or used these trade secrets, for the use and benefit of Better, a competitor of Luminate.

111.   Defendant Lynn utilized such trade secrets without Luminate's express or implied consent, all to Luminate's detriment.  Indeed, she has assisted Better with trying to replicate Luminate's operations and financials sufficient to prepare to enter the retail loan market, which could not have been accomplished without the trade secret and data theft described herein unless through the expenditures of years of effort and resources, or the financial commitment of purchasing a competing business in arm's length negotiations.

112.   Defendant Lynn's misconduct detailed herein constitutes misappropriation of Luminate's trade secrets and violates the NUTSA.  As a direct and proximate result of Defendant Lynn's conduct, Luminate has been damaged in an amount to be proven at trial.

113.   Luminate has also incurred, and will continue to incur, additional damages, costs, and expenses, including attorneys' fees, as a result of Defendant Lynn's misappropriation.  As a further proximate result of the misappropriation and use of Luminate's trade secrets, Defendant Lynn and her subsequent employer, Better, were unjustly enriched.

114.   Pursuant to section 600A.040 of Nevada's Revised Statutes, Luminate is entitled to an injunction to prohibit Defendant Lynn from using, disclosing and/or otherwise benefiting from Luminate's trade secrets; to eliminate any commercial advantage that Defendant Lynn may otherwise derive from their misappropriation; and to require Defendant Lynn to immediately return to Luminate all of its confidential information, documents, and other misappropriated materials.

115.   Pursuant to section 600A.050 of Nevada's Revised Statutes, Luminate is entitled to recover its damages incurred by virtue of Defendant Lynn's wrongful misuse of its trade secrets, in addition to disgorgement of all amounts by which Defendant Lynn has been and will be unjustly enriched or the payment of a reasonable royalty, in an amount to be proven at trial.

116.   In performing the conduct described herein, Defendant Lynn acted willfully and maliciously, intending to injure Luminate and to wrongfully obtain an advantage at Luminate's expense.  Pursuant to section 600A.050 of Nevada's Revised Statutes, Luminate is entitled to all

remedies available under the law to compensate Luminate, including but not limited to, an award of exemplary damages against Defendant Lynn.

117.    Pursuant to section 600A.060 of Nevada's Revised Statutes, Luminate is also entitled to an award of its attorneys' fees and costs incurred in this action.

**COUNT V**
**Tortious Interference with Contractual Relations**

118.    Luminate incorporates all previous paragraphs as if fully set forth herein.

119.    Luminate's employment terms with its at-will employees included their agreement not to engage in outside employment which conflicted with their job duties at Luminate or the Company's interests.  Moreover, its employees agreed to abide by "the principles of fair dealing and ethical conduct" and to demonstrate "the highest standards of conduct and personal integrity."  *See* Exhibit 2 at § 5.2.

120.    Upon information and belief, Defendant Lynn knew that Luminate's employees had such obligations as terms of their employment because she reviewed and acknowledged the Company's employee handbook.

121.    As alleged in detail above Defendant Lynn helped structure and coordinate the submission of offers for lucrative compensation terms to high-level Luminate employees if they engaged in the solicitation of other Luminate employees to join Better in direct violation of their contractual agreements.

122.    Defendant Lynn worked with Better to induce Luminate employees to breach the terms of their employment by offering lucrative contracts with Better and revealing plans to surreptitiously move Luminate's NEO division to Better, without fair compensation to Luminate, as well as by encouraging and facilitating other Luminate employees to meet with Better representatives about employment at the competing NEO division they were creating.

123.    Defendant Lynn knew that her misconduct would cause Luminate to lose employees and the business they generate.  Defendant Lynn engaged in such conduct with the purpose of causing this loss.

124.    As a result of Defendant Lynn's purposeful actions, Luminate has suffered and continues to suffer damages in the form of monetary losses.

125.   Upon information and belief, Defendant Lynn took these actions to economically harm Luminate, for her own personal enrichment and that of Luminate's competitor, Better.

**RELIEF REQUESTED**

**WHEREFORE**, as to all counts, Luminate respectfully requests that the Court enter judgment in its favor and award the following relief:

a.   An injunction to prohibit Defendant Lynn from, among other things, using, disclosing and/or otherwise benefiting from Luminate's trade secrets; to eliminate any commercial advantage that Defendant Lynn may otherwise derive from their misappropriation; and to require Defendant Lynn to immediately return to Luminate all of its confidential information, documents, and other misappropriated materials, including but not limited to the flash drive of its Company data she possesses; and

b.   One Million Dollars in actual damages or such other amount as may be proven at trial; and

c.   Trebling of actual damages arising out of Luminate's claims under the DTA and NUTSA; and

d.   Punitive damages arising out of Defendant Lynn's statutory violations in an amount not less than Five Million Dollars; and

e.   Pre- and post-judgment interest; and

f.   Costs; and

g.   Statutory attorneys' fees; and

h.   Granting Luminate such other and further relief as the Court may deem just, equitable, and proper.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## DEMAND FOR JURY TRIAL

Luminate respectfully requests and demands a jury trial on all issues so triable.

DATED this 23rd day of December, 2024.

WILEY PETERSEN

/s/ Jason M. Wiley

_____

JASON WILEY, ESQ.
Nevada Bar No. 9274
10000 West Charleston Blvd., Ste. 230
Las Vegas, Nevada 89135
Telephone: 702.910.3329
Facsimile: 702.553.3467
jwiley@wileypetersenlaw.com

ARI KAREN, ESQ. (*pro hac vice forthcoming*)
akaren@mitchellsandler.com
LUCAS MARKOWITZ, ESQ. (*pro hac vice forthcoming*)
lmarkowitz@mitchellsandler.com
ALEXANDER ROGOSA, ESQ. (*pro hac vice forthcoming*)
Will comply with LR IA 11-2 within 14 days
arogosa@mitchellsandler.com
**MITCHELL SANDLER PLLC**
2020 K Street NW, Suite 760
Washington, DC 20036
Office: (202) 886-5265

*Attorneys for Plaintiff Luminate Home Loans, Inc.*

1

## VERIFICATION

2

I, __TARYN S REUTER__, state that I serve as __CEO__ for

3

Luminate Home Loans, Inc., the Plaintiff in this matter. I declare under penalties of perjury that I have

4

read and understand this Complaint and know the contents to be true of my own personal knowledge,

5

except for those matters and things set forth upon information and belief, and as to those matters and

6

things, I believe them to be true.

7

8 

9 _____

10

11

Sworn to and subscribed before me this __20th__ day of December, 2024.

12 _____Diane Schnell_____

13 Notary Public

14

15

My commission expires: __01/31/2026__.

16

17
```
DIANE SCHNELL
NOTARY PUBLIC
MINNESOTA
My Commission Expires  01/31/2026
```

18

19

20

21

22

23

24

25

26

27

28